Juana Perez GONZALES, Ramon Vargas and Narcissa Vargas, individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Con F. SHEA, individually and as Director of the Colorado Department of Social Services, Charline J. Birkins, individually and as Director of the Colorado State Division of Public Welfare, Peter Samac, Ernest J. Bloedorn, Damian P. Ducy, John L. Haley, James A. Henderson, Gail F. Ouren, Henry J. Tupper, Willie E. Anthony, James H. Vincent, individually and as constituting the Colorado State Board of Social Services, Bernard Valdez, individually and as Manager of the Denver Department of Welfare of the City and County of Denver, Orlando Romero, individually and as Director of the Denver Department of Welfare of the City and County of Denver, and all other persons similarly situated, Defendants.

Soledad NAVA and Francisca Ayala, individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Con F. SHEA, individually and as Director of the Colorado Department of Social Services, Charline J. Birkins, individually and as Director of the Colorado State Division of Public Welfare, Peter Samac, Ernest J. Bloedorn, Damian P. Ducy, John L. Haley, James A. Henderson, Gail F. Ouren, Henry J. Tupper, Willie E. Anthony, James H. Vincent, individually and as constituting the Colorado State Board of Social Services, William R. Maddock, individually and as Supervisor of the Adult Services and Medical Division of the Pueblo County Department of Public Welfare, Robert N. Trunk, individually and as Supervisor of the Eligibility Division of the Pueblo County Department of Public Welfare, and James H. Walch, individually and as Director of the Pueblo County Department of Public Welfare, and all other persons similarly situated, Defendants.

Civ. A. Nos. C–1920, C–2066.

United States District Court, D. Colorado.

Oct. 9, 1970.

Richard F. Hennessey, Kim B. Batcheller, Ruthanne Polidori, Robert P. Vogel, Legal Aid Society of Metropolitan Denver, Denver, Colo., A. Andrew Borg, Colorado Rural Legal Services, Inc., Greeley, Colo., Robert P. Borsody, Center on Social Welfare Policy and Law, New York City, of counsel, for plaintiffs Gonzales and others.

Albert G. Davis, Theron Pray O'Connor, Pueblo County Legal Services, Inc., Pueblo, Colo., for plaintiffs Nava and others.

Frank A. Elzi, Asst. City Atty., Denver, Colo., for defendants Bernard Valdez and Orlando Romero.

Duke W. Dunbar, Atty. Gen., John P. Moore, Deputy Atty. Gen., by Douglas D. Doane, Special Asst. Atty. Gen., Denver, Colo., for defendants Con F. Shea, Charline J. Birkins, and members of Colorado State Board of Social Services.

Edwin K. McMartin, Pueblo, Colo., for defendants William R. Maddock and James H. Walch.

Robert N. Trunk, pro se.

Before BREITENSTEIN, Senior Circuit Judge, and ARRAJ and DOYLE, District Judges.

## MEMORANDUM OPINION AND ORDER

DOYLE, District Judge.

Involved herein is the question of constitutionality of the Colorado Old Age Pension amendment. The basis for the attack is its requirement of United States citizenship. The plaintiffs, who are noncitizens of the United States, maintain that this amendment is discriminatory and invalid under the Fourteenth Amendment of the Constitution of the United States. United States citizenship is an absolute requirement for all three categories of Old Age Pension assistance pursuant to Article XXIV, Section 3 of the Colorado Constitution and Colo.Rev.Stat.Ann. § 101–1–4(1) (a) (f) and § 101–1–5(1) (a) (c) (1963).

Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure declaring Article XXIV, Section 3 of the Colorado Constitution, Colo.Rev.Stat.Ann. § 101–1–4(a) (f) and any enforcement thereof, and related rules, regulations and policies pursuant thereto invalid and unconstitutional, insofar as these laws require United States citizenship as an absolute condition of eligibility for Old Age Pension; and also demand that this Court permanently enjoin the defendants from enforcing the Article, C.R.S. § 101–1–4 and related regulations, rules and policies pursuant thereto insofar as these laws result in an unconstitutional and illegal denial of Old Age Pension benefits solely on the basis of lack of U. S. citizenship of the applicant.

Plaintiffs have filed this class action pursuant to Rule 23(a) and (b) (2) of the Federal Rules of Civil Procedure on behalf of themselves and all persons similarly situated—*i. e.*, all other persons who are resident aliens of the United States and residents of the State of Colorado who would be eligible for and entitled to receive benefits under Colorado's Old Age Pension program except that they do not meet the citizenship requirement. They contend that the citizenship requirement (1) denied them equal protection of the laws, due process of law, and the right to travel freely interstate; and (2) is contrary to Title 42 U.S.C. § 1981 (1964) which secures to all persons the full and equal benefits of all laws for their security.

### I

### JURISDICTION

Jurisdiction of the Court is based on 28 U.S.C. § 1343(3) and (4), 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 and 2202, this being an action for declaratory and injunctive relief to redress the deprivation under color of state law of rights, privileges and immunities secured to plaintiffs by the Constitution and laws of the United States. Plaintiffs seek to enjoin a state statute on constitutional grounds which are not insubstantial; a three-judge court has been convened pursuant to 28 U.S.C. §§ 2281 and 2284. The matter has been heard and the cause now stands submitted.

### II

### THE PLAINTIFFS' SITUATIONS

From the factual material which has been presented and which is in the file, it would appear that the plaintiffs are not being deprived altogether of public assistance. They now receive aid under one of the categorical programs, either Aid to Needy Disabled or income from Social Security. Thus, their argument is that they would receive a greater sum of money if they were declared eligible for Old Age Pension.

The particular facts at hand pertaining to the plaintiffs are as follows:

A. Juana Perez Gonzales

This plaintiff has received Aid to Families with Dependent Children from 1947 to 1956 and since 1956 has received Aid to Needy Disabled (AND) due to medical problems. At present, she receives $32.00 from AND and $60.30 from Social Security benefits, making a total of $92.30 per month income from all sources. Mrs. Gonzales states that if she were a U. S. citizen she would be eligible for $130.00 per month from Old Age Pension.[1]

B. Ramon Vargas and Narcissa Vargas

Mr. Vargas worked in the Colorado beetfields from 1923 to 1948. He has received some form of public assistance since 1948. His wife and he both receive AND with a total grant of $143.00. He states that he is allotted $15.00 per month for a special diet, but does not state if that is in addition to or included in the $143.00 figure. Mr. Vargas states: "My wife and I together would be eligible for $262.00 per month compared to our current $143.00 per month combined income."

Mrs. Vargas receives AND which *includes* a $9.00 per month special dietary need allowance.[2] She maintains that if she were a citizen, she would receive $130.00 per month or $262.00 per month for both herself and her husband. On the basis of the new minimum allotment

---

1. Plaintiffs' Reply Memorandum of Law, however, indicates that the basic minimum award has been raised to $134.00 per month, pursuant to Article XXIV, Sec. 6(c) of the Colorado Constitution. Since the amount of an applicant's net income from whatever source must be deducted from the amount of the pension award,

pursuant to Colo.Rev.Stat.Ann. § 101–1–7(1) (1963), this plaintiff would be entitled to receive $41.70 in Old Age Pension if she were to become eligible.

2. The total allotment for her and her husband is $143.00.

of $134.00 per month, Mr. and Mrs. Vargas would be entitled to receive a total of $268.00 per month or $125.00 per month more than their present combined income of $143.00.

### C. Lupe Bueno (Intervenor)

Mr. Bueno's wife presently receives $105.00 per month in Old Age Pension benefits; he and his wife presently receive $69.00 per month in Social Security benefits; and he presently receives $15.00 per month in medical benefits. Mr. Bueno does not qualify for AND, according to defendants, because his family income exceeds AND standards of the State of Colorado.[3] Assuming that Lupe Bueno receives $35.00,[4] his present income would appear to amount to $50.00 per month. If he were eligible for Old Age Pension (OAP), his monthly income would be increased to $134.00 or by an additional amount of $84.00 per month.

### III

### HISTORY OF THE COLORADO OLD AGE PENSION

As noted above, the Colorado pension law is in the form of a constitutional amendment and is set forth in detail in Article XXIV, Sections 1–9. This amendment originated with the passage of the Social Security Act of 1935, 42 U.S.C. § 301 *et seq.* Prior to the passage of this amendment Colorado had a poor law which paid approximately $8.15. At this time a movement was in progress to adopt the so-called Townsend Plan which would have paid every citizen in the nation $200.00 per month at age 60. This philosophy was rejected as unrealistic, and the amendment was authored by Chief Justice O. Otto Moore who is generally recognized as "the father of the Old Age Pension amendment." At the time this amendment guaranteed to eligible persons the sum of $45.00 per month. It was written, according to Justice Moore, as a program of social insurance.[5]

Moreover, an effort was made to draft a law having a sound economic and legal basis. Among the sources consulted by Justice Moore in this effort was The Report of the President's Committee on Economic Security. A portion of this report was written into the amendment.[6]

Apparently this report was the origin of the citizenship requirement, and this dispels any notion that it had an invidious purpose or motive. In the years following, the presence of this requirement was never challenged, notwithstanding that it was embattled on many occasions through the years.[7] Efforts were made to repeal the amendment at the polls on several occasions. These all failed.

Perhaps the outstanding feature of the pension fund program is its trust fund character. Section 1 of the Article pro-

---

3. Brief of defendants Valdez and Romero.

4. Approximately one-half of his *family* Social Security allowance.

5. It is true that the Colorado law is more liberal in defining need than most states. We recognize the truth, as most earnest students of the problem do, that a program of social insurance—or old-age pensions—does not stand, and should not stand, upon the same plane as poor relief. * * *
   * * * * *
   (Quoting Dr. Abraham Epstein): "The poor law seeks to make its relief degrading and obnoxious in order to discourage people from applying. Social insurance, on the contrary, seeks to establish self-respect and independency through granting the insured a legal right to benefit. * * * "

O. Moore, Mile High Harbor 221–22 (1947).

6. "We recommend that aid be granted only to those states which enact laws that are state-wide in scope and are mandatory upon them. Such laws may limit the granting of pensions to citizens of the United States and residents of the state, but may not require a longer period of residence than five years, within the last ten years preceding the application for a pension."
   *Id.* at 93 (quoting from The Report of the President's Committee on Economic Security (1935)).

7. *See, e. g.,* In re Interrogatories of the Governor, 99 Colo. 591, 65 P.2d 7 (1937); Davis v. Pensioners Protective Association, 110 Colo. 380, 135 P.2d 142 (1943).

vides for the creation of a special fund in the Treasury of the State of Colorado. Section 2 allocates and earmarks 85 percent of all excise taxes, including sales taxes, liquor taxes, grants and aid from the federal government for old age assistance and inheritance taxes, to the Old Age Pension fund.

A further provision of the amendment (Section 5) prohibits the repeal of any revenue act providing funds for the Old Age Pension unless a substitute revenue provision is enacted which furnishes an equal amount of money. Still another section of the Article (Section 7) sets up a five million dollar stabilization fund for the purpose of stabilizing payments of basic minimum awards. Monies remaining in the fund after the establishment of this fund are paid into a health and medical care fund to provide health and medical care to persons who qualify to receive pensions. Monies which accrue to the medical care fund in excess of ten million dollars are authorized to be transferred to the general fund of the state.

Finally, Section 8 of the amendment declares:

. All moneys deposited in the old age pension fund shall remain inviolate for the purpose for which created, and no part thereof shall be transferred to any other fund, or used or appropriated for any other purpose, except as provided for in this article.

The provisions relative to the stabilization fund and the health and medical care fund, together with the provision for the diversion of excess to the general fund, were amendments to the original Article and were approved by the voters on November 6, 1956.

The trust fund aspect of the Old Age Pension amendment was, as noted above, attacked on several occasions, not only at the polls but also in the courts. Thus, in 1937 the Colorado General Assembly authorized the diversion of a portion of the earmarked funds for the cost of administration of the welfare program and permitted some disbursements "as the General Assembly shall direct." However, in Davis v. Pensioners Protective Association, 110 Colo. 380, 135 P.2d 142 (1943), the Supreme Court of Colorado declared this effort unconstitutional as in violation of Section 8 quoted above, and in still a later version of the same case, Pensioners Protective Association v. Davis, 112 Colo. 535, 150 P.2d 974 (1944), the court, in considering a demand for cost of suit and attorney's fees, denominated the fund a trust fund in which the monies are specially segregated for a special and designated use. The Colorado court thus recognized the high degree of interest which the beneficiaries have in the preservation of this fund.

A guaranteed minimum pension to eligible recipients is a highly important quality or characteristic which threads through all of its sections.

Finally, the requirement of United States citizenship was in the Article from the very outset. It has never been challenged on this ground prior to the present attack, and it is highly questionable whether it is severable. The amendment was created for the benefit of citizens and it is doubtful whether it would have been adopted or whether it would have withstood the many efforts to destroy if if it had embraced noncitizens as well as citizens. Therefore, in all likelihood, a holding that the citizenship requirement is unconstitutional could well result in destruction of the entire system.

## IV

## DISCUSSION OF ISSUES AND APPLICABLE TESTS

The Fourteenth Amendment to the Constitution of the United States provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The question is whether the state constitutional provision before us, which distinguishes between citizens and noncitizens in the granting and withholding of old age pensions, creates a classification

which results in an invidious discrimination between citizens and noncitizens denying the noncitizens equal protection of the laws. We consider this to be the only issue which offers any promise. It is highly doubtful whether the right to travel urged by the plaintiffs and applied to citizens of the United States in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) has application to the plaintiffs.

■■ The equal protection clause of the Fourteenth Amendment is not limited to citizens. The phrase "any person" includes resident aliens.[8] The state has some latitude in creating classifications, and ordinarily a classification does not violate the equal protection clause "if the classification has some 'reasonable basis.'"[9] "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."[10] This test of "any reasonable basis" has generally been applied in cases having to do with state regulation of business or industry.[11] However, the Supreme Court has recently held that it is also applicable to the administration of public welfare assistance notwithstanding that this "involves the most basic economic needs of impoverished human beings."[12]

■ A more demanding test is the "compelling state interest" test. This is applied to certain "suspect classifications" or interests which are said to be "fundamental" in the context of the Equal Protection Clause.[13] Where the classification is of this nature it is said that there must be a compelling state interest in order to justify the discriminatory classification.[14]

■ It is clear from the decision in *Dandridge* that fiscal regulation statutes, including those involving public welfare, are not subject to the so-called "suspect classification" doctrine. However, there is in addition in this case a classification based on citizenship or alienage. As to this, the Supreme Court in Takahashi v. Fish & Game Comm'n, *supra*, held a California law invalid which denied fishing licenses to aliens. Discrimination based on citizenship was there equated to racial discrimination, and it was said that the power of a state to apply its laws exclusively to alien inhabitants as a class is confined within narrow limits. The Supreme Court in *Takahashi* applied a balancing test in concluding that the State of California, assuming that it had a proprietary interest in the fish, was not advancing an interest which outweighed the interests

8. Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 420, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). The Court in Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886), said that the equal protection clause is "universal in [its] application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a protection of equal laws."

9. Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501 (1970).

10. McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

11. Dandridge v. Williams, *supra* note 9, 397 U.S. at 485, 90 S.Ct. at 1162, 25 L.Ed.2d at 502.

12. *Id.*

13. *See, e. g.*, Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed. 2d 600 (1969); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Gibson v. Florida Legislative Investigating Comm., 372 U.S. 539, 546, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). In McLoughlin v. Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) and Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the Court held that the state had not sustained its burden of justifying racial classifications by showing a legitimate "overriding purpose" served thereby.

14. In subjecting these classifications "to the most rigid scrutiny", the courts have required that the classification bear more than a mere rational connection with a legitimate public purpose. Developments in the Law—Equal Protection, 82 Harv.L. Rev. 1065, 1088 (1969).

of the deprived aliens and, thus, it employed a test similar to the compelling state interest test enunciated and articulated in Shapiro v. Thompson, *supra*.[15] Thus, although it is not entirely clear that the compelling state interest test applies in judging the instant case, it is to be concluded that because of the classification based on citizenship-noncitizenship there must be at least a guarded or cautious weighing of the opposing interests.

## V

### VALIDITY OF THE CLASSIFICATION

■ Plaintiffs rely on the recent decision of the Supreme Court in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), which involved the validity of a Connecticut aid to dependent children statute which imposed a one-year residence requirement, and similar District of Columbia and Pennsylvania statutes pertaining in the District of Columbia case to aid to the permanently disabled and in the Pennsylvania case to aid to dependent children. Against the contention that this type of classification was to be upheld as a fiscal device to protect the integrity of the programs, it was held that this distinction between groups of United States citizens was an arbitrary effort to deter the "in-migration of indigents." The Court applied the compelling state interest test and was unable to find an interest which justified the discrimination between residents and non-residents.

Far more significant than *Shapiro* is the more recent decision of the Supreme Court in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), which involved the validity of a Maryland statute which established a maximum amount which could be paid to a family under the federal aid to dependent children program. The Maryland program increased the standard of need with each additional child, but limited the total grant to $250.00 per family in Baltimore and $240.00 per family in other places within the state. The Court rejected the argument that certain children were denied relief altogether, saying that it was just as reasonable to conclude that the share of each child was diminished after the family reached a certain size. The Court adopted the view that a state statute is valid even though inequitable and unwise, and even though the classification is imperfect, if the classification has some reasonable basis. It said:

> To be sure, the cases cited, and many others enunciating this funda-

---

15. It remains a somewhat open question as to whether alienage constitutes an "inherently suspect classification" for the purposes of the Fourteenth Amendment's Equal Protection Clause. Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915), distinguished "special public interest" cases in which "regulation or distribution of the public domain, or of the common property or resources of the people of the state, the enjoyment of which may be limited to its citizens as against both aliens and citizens of other states." *Id.* at 40–41, 36 S.Ct. at 10. A long line of cases has held similarly that a "special public interest" must be shown in order to justify discriminating against aliens and that the "ownership-proprietorship" distinction was sufficient to satisfy that requirement. *See, e. g.,* Heim v. McCall, 239 U.S. 175, 187–190, 36 S.Ct. 78, 60 L.Ed. 206 (1915). The "ownership-proprietorship" distinction, however, does not seem sufficient in the instant case because (1) the analogous "right-privilege" rationale has been rejected, *see, e. g.,* Shapiro v. Thompson, 394 U.S. at 627 n. 6, 89 S.Ct. 1322; Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 82 Harv.L.Rev. 1439 (1968); (2) the state has no proprietory interest at least in the federal funds used to support "Old Age Assistance"; and (3) the interest of the state here is much broader than mere proprietorship. Moreover, the balancing approach of *Takahashi* strikes us as being more reasonable and less mechanical than the proprietorship criterion. Also, it has been considered similar to racial discrimination cases. Nevertheless, it is clear from the line of cases referred to above that distinctions based on alienage have been upheld where the state is shown to be advancing a legitimate property interest.

mental standard under the Equal Protection Clause, have in the main involved state regulation of business or industry. The administration of public welfare assistance, by contrast, involves the most basic economic needs of impoverished human beings. We recognize the dramatically real factual difference between the cited cases and this one, but we can find no basis for applying a different constitutional standard. See Snell v. Wyman, D.C., 281 F.Supp. 853, aff'd, 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511. It is a standard that has consistently been applied to state legislation restricting the availability of employment opportunities. Goesaert v. Cleary, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163; Kotch v. Board of River Port Pilot Com'rs, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093. See also Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435. And it is a standard that is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of wise economic or social policy. 397 U.S. at 485, 90 S.Ct. at 1162.

As we view it, the distinctions upheld in *Dandridge* are more drastic and severe than in the case at bar, especially since the parties before the Court were citizens.

In any event, the interest of the state in upholding the instant program is substantial and compelling. The program which is here under attack is a special and deeply rooted one. It was adopted and has been maintained only after bitter struggle.

1. The program is carefully constructed to insure the accomplishment of its objectives.

   a. It is specially financed.

   b. The special fund created has a trust character. The interests of the recipients for whose benefit it was created would be affected by a ruling of invalidity.

   c. The program is time tested and now has almost universal acceptance.

2. The requirement of citizenship is an important cornerstone of the program which probably could not be severed. A holding of invalidity at the behest of these plaintiffs would then be likely to destroy the program as a whole.

Thus, there are compelling reasons which cause us to be reluctant to tamper with this amendment. We must therefore turn back this effort as one which, in seeking to help the plaintiffs, holds a threat of injury to countless others and which threatens chaos to a well established state program.

We have considered two recent district court decisions from Arizona and Pennsylvania. Leger v. Sailer, —— F.Supp. —— (D.C.Pa.1970), struck down a Pennsylvania. Leger v. Sailer, No. 69–2869 (D.C.Pa. July 13, 1970), struck down a Pennsylvania statute which granted general assistance to citizens and at the same time denied it altogether to aliens. The only state interest which was there put forward was economy. The court held this to be insufficient.

A divided Arizona court in Richardson v. Graham, 313 F.Supp. 34 (D.C.Ariz. 1970), invalidated an Arizona statute which imposed either a citizenship or 15-year residency requirement on aliens as a basis for general assistance, blind assistance and old age assistance.

In both of these cases the magnitude of the discrimination was great when weighed against the state interest which was in the balance—a condition which does not obtain here. The Colorado amendment is a unique one.

We do not say that the present case is free of inequity. However, our holding does not and can not do more than determine the constitutional validity of the present provision. It is open to the Colorado General Assembly to cure the inequity which has been brought to light in the case at bar.

The defendants' motion for summary judgment is granted. That of plaintiffs'

is denied. The Clerk is directed to enter judgment for the defendants and against the plaintiffs dismissing the complaint and cause of action.