Elvin O. BENSON, Plaintiff and Appellee,

v.

NORTH DAKOTA WORKMEN'S COMPENSATION BUREAU, Defendant and Appellant.

Civ. No. 9238–A.

Supreme Court of North Dakota.

July 16, 1979.

On Denial of Rehearing Aug. 28, 1979.

Dale W. Moench, Dickinson, for plaintiff and appellee.

Murray G. Sagsveen, Sol. Gen., Bismarck, and Richard J. Gross, Special Asst. Atty. Gen., Workmen's Compensation Bureau, Bismarck, for defendant and appellant.

Lisa Knazan and Arcelia Romo Perez, Migrant Legal Services, Fargo, amicus curiae, on briefs.

PEDERSON, Justice.

The district court of Stark County has twice held in this case that the statute which excludes agricultural service from the mandatory provisions of the Workmen's Compensation Act violates both the Constitution of North Dakota and the Constitution of the United States. When the first holding was appealed to this court, we remanded because of procedural deficiencies and made suggestions as to procedure and issues. *Benson v. N. D. Workmen's Comp. Bureau*, 250 N.W.2d 249 (N.D.1977). On this appeal, we will address the merits of the constitutionality of the agricultural exclusion under the Workmen's Compensation Act (Chapter 162, S.L. 1919—now Title 65, NDCC).

There is no factual dispute. Although the trial subsequent to our previous holding in *Benson v. N. D. Workmen's Comp. Bureau, supra,* developed the facts in much greater detail, the essential facts are the same as set forth in our previous opinion. The record reveals that Benson's scope of employment as an agricultural employee was extremely broad, and included: milking, livestock feeding, equipment operation, cleaning cattle, cleaning barn, hauling silage and grain, assisting in calving, repairing machinery, welding, tuning motors, changing oil and greasing machinery, repairing fences and corrals, operating augers, carpentry, driving tractors, trucks and swathers, chopping corn, operating a power saw, painting, and "about anything you could name."

Although North Dakota's Workmen's Compensation Act has been often amended, the stated purpose of the Act has remained essentially as enacted in 1919. The title to the Act clearly discloses that this is an act creating a fund for the benefit of employees injured, and the dependents of employees killed in hazardous employment. Section 1 of Chapter 162 (now § 65–01–01, NDCC), provides:

"The state of North Dakota, exercising its police and sovereign powers, declares that the prosperity of the state depends in a large measure upon the well-being of its wage workers, and, hence, for workmen injured in hazardous employments, and for their families and dependents, sure and certain relief is hereby provided regardless of questions of fault and to the exclusion of every other remedy, proceeding, or compensation, except as otherwise provided in this title, and to that end, all civil actions and civil causes of action for such personal injuries and all jurisdiction

of the courts of the state over such causes are abolished except as is otherwise provided in this title."

Section 2 of Chapter 162 (now § 65–01–02, NDCC), provides in part:

"65–01–02. Definitions.—Whenever used in this title:

. . . .

"3. 'Employment' shall mean . . . all private employments;

"4. a. 'Hazardous employment' shall mean any employment in which one or more employees are employed regularly in the same business or in or about the establishment except:

(1) Agricultural or domestic service; . . .

. . . . .

"5. 'Employee' shall mean every person engaged in a hazardous employment under any appointment,

. . .

. . . . .

"7. 'Employer' shall mean:

. . . . .

c. Every person, partnership, association, and private corporation, . . . ."

The language chosen by the legislature when enacting Chapter 162 is, at best, uncertain and perplexing. In declaring the purpose of Chapter 162 and in defining its terms, the legislature resorted to a legal fiction. Apparently believing it necessary, in order to provide a benefit to workers who are injured, the legislature labeled certain employment as hazardous and then defined the term in such manner as to eliminate any concern as to whether or not a hazard existed. The exclusion of agricultural services was not based upon a conclusion that it was nonhazardous when compared to services that were not excluded. We will assume, as administrators and courts have for 60 years, that agricultural employment is excluded from mandatory workmen's compensation coverage without regard to its relative hazardousness.

There was no contention by anyone in this case that agricultural employment is not hazardous. By the very nature and scope of tasks required of a general agricultural service employee, such as Benson in the instant case, a jack-of-all-trades develops who may be the master-of-none. While operating a power saw a few minutes during a week, we would not expect Benson to be as proficient or careful as a carpenter helper who operates a power saw forty hours a week. The composite activities of a farmhand are obviously more hazardous than the total of the individual activities when performed full time.

Both parties agree that the issue for this court is whether the exclusion of agricultural employees from mandatory coverage under § 65–01–02(4)(a)(1), NDCC, violates the Constitutions of North Dakota and the United States. The thrust of the holding of the district court is that the statutory exclusion: (1) deprives Benson of equality as guaranteed by § 1 of Article I, North Dakota Constitution; (2) imposes upon him a non-uniform burden in violation of § 11, Article I, North Dakota Constitution; (3) violates his right to due process of law under § 13, Article I, North Dakota Constitution; (4) invidiously discriminates against him contrary to § 20, Article I, North Dakota Constitution; and (5) fails to provide him with due process and equal protection assured by § 1, Article XIV, United States Constitution.

*Standards of Constitutional Review*

■ Our court has reiterated the rule many times that an act of a legislature is presumed to be valid, and any doubt as to its constitutionality must, where possible, be resolved in favor of its validity. *So. Valley Grain Dealers v. Bd. of Cty. Com'rs*, 257 N.W.2d 425, 434 (N.D.1977). See also, *Caldis v. Board of County Commissioners*, 279 N.W.2d 665 (N.D.1979); *Ralston Purina Company v. Hagemeister*, 188 N.W.2d 405 (N.D.1971); *Souris River Telephone Mutual Aid Corp. v. State*, 162 N.W.2d 685 (N.D. 1968); *Montana-Dakota Utilities Co. v. Johanneson*, 153 N.W.2d 414 (N.D.1967).

In some of our recent decisions we have discussed the "three-standard of scrutiny" used to determine whether a statute is constitutionally valid. *State v. Knoefler*, 279 N.W.2d 658 (N.D.1979); *Herman v. Magnuson*, 277 N.W.2d 445 (N.D.1979); *Arneson v. Olson*, 270 N.W.2d 125 (N.D.1978). All three of these cases refer us to *Johnson v. Hassett*, 217 N.W.2d 771 (N.D.1974), where we identify the standards as: (1) the traditional rational-basis standard under which a statute is upheld if the classification is not patently arbitrary or if it bears some reasonable relationship to a legitimate governmental interest; (2) the strict judicial-scrutiny standard used when the classification is inherently suspect, or concerns a fundamental interest; and (3) an intermediate standard that has been difficult to label or define but which closely approximates the historical, substantive due-process test. This standard requires a close correspondence between statutory classifications and legislative goals. For interest, see Paulsen, *The Persistence of Substantive Due Process in the States*, 34 Minn.L.Rev. 91 (1950). Each of the first two standards is presumably applied in the federal court system and would have to be applied by this court here insofar as Benson argues that the Fourteenth Amendment to the United States Constitution is violated by our statute. The substantive due-process test would be inappropriate for that review. But see, *Lalli v. Lalli*, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978).

In *Herman v. Magnuson, supra*, 277 N.W.2d at 451, our court discussed the three standards of scrutiny to determine which of the three was applicable to the circumstances of that case. One of the issues in *Herman* was whether the notice provisions of §§ 40–42–01 and 40–42–02, NDCC, requiring a claim to be filed prior to the commencement of a suit against a municipality, violated equal protection. We rejected the application of the traditional rational-basis standard used in *Tharaldson v. Unsatisfied Judgment Fund*, 225 N.W.2d 39 (N.D.1974), because the right to recover from a municipality was severely limited by the notice provisions contained in Chapter 40–42, NDCC, and, hence, a stricter standard of review was appropriate. Because there was no "fundamental interest" or "suspect-classification" issue presented, the "strict-scrutiny" test was also inappropriate. *State ex rel. Olson v. Maxwell*, 259 N.W.2d 621 (N.D. 1977). Our court, in *Herman v. Magnuson, supra*, 277 N.W.2d at 451, concluded that the intermediate standard of review requiring a close correspondence between a statutory classification and legislative goals was the proper standard because the issue involved a limitation upon the authority of an injured party to bring an action against the tort-feasor.

Although we are not concerned in this case with a limitation on actions for common-law tort remedies, we are concerned with the complete exclusion of a legislatively created remedy for personal injury to one class of employees. Our concern here closely resembles those concerns addressed in cases using the intermediate close-correspondence test (*Herman v. Magnuson, supra*; *Arneson v. Olson, supra*; *Johnson v. Hassett, supra*), rather than those cases in which we have applied the traditional rational-basis test. *Tharaldson v. Unsatisfied Judgment Fund, supra*. The complete exclusion of agricultural employees from workmen's compensation not only deprives the farm worker of a convenient remedy, it also limits his remedy to a common-law tort action in which the farm worker must prove all elements of a tort before he can recover. Employees covered by workmen's compensation in other similar occupations do not have to make this showing.

To determine whether the exclusion of agricultural employees from workmen's compensation violates equal protection considerations in this case, there must .be a close correspondence between the statutory exclusion and the legislative goals to be accomplished by that exclusion. Prior to developing this analysis, a discussion of the early precedents concerning the validity of the agricultural exclusion will be helpful.

### Early Precedents

In early judicial decisions, comments concerning the agricultural exemption from

state workmen's compensation acts inferred that the nexus between the classification and state objectives was obvious. In *New York Central R. Co. v. White*, 243 U.S. 188, 208, 37 S.Ct. 247, 254, 61 L.Ed. 667 (1917), although it was not an issue, the United States Supreme Court offered the gratuitous advice that:

"The objection under the 'equal protection' clause is not pressed. The only apparent basis for it is in the exclusion of farm laborers and domestic servants from the scheme. But, manifestly, this cannot be judicially declared to be an arbitrary classification, since it reasonably may be considered that the risks inherent in these occupations are *exceptionally patent, simple and familiar*." [Emphasis supplied.]

Another of the early declarations, relying in great part upon *New York Central R. Co. v. White, supra*, also inferred that farm work is not hazardous and not likely to produce injuries. See *Middleton v. Texas Power & Light Co.*, 249 U.S. 152, 157, 39 S.Ct. 227, 229, 63 L.Ed. 527 (1919), which stated:

"However, we are clear that the classification cannot be held to be arbitrary and unreasonable. The Supreme Court of Texas in sustaining it said (108 Tex. 96, 110, 111, 185 S.W. 556):

'Employes of railroads, those of employers having less than five employes, domestic servants, farm laborers and gin laborers are excluded from the operation of the act, but this was doubtless for reasons that the Legislature deemed sufficient. The nature of these several employments, the existence of other laws governing liability for injuries to railroad employes, *known experience as to the hazards and extent of accidental injuries to farm hands*, gin hands and domestic servants, were all matters no doubt considered by the Legislature in exempting them from the operation of the act. Distinctions in these and other respects between them and employes engaged in other industrial pursuits may, we think, be readily suggested. We are not justified in saying that the classification was purely arbitrary.'" [Emphasis supplied.]

The North Dakota case of *State v. Hagan*, 44 N.D. 306, 175 N.W. 372 (1919), has been interpreted as holding that the Workmen's Compensation Act does not violate the provisions of the Constitution involving due process or equal protection. In that opinion, as published, Syllabus ¶ 5 says, in part:

"It is *held* that these provisions in the act are not deemed so arbitrary and unreasonable as a matter of law as to be violative of relator's constitutional rights, either under the due process clause, the equal privileges and immunities clause, or the clause concerning the impairment of the obligation of contracts of either the federal or state Constitution." [Emphasis in the original.]

Although two of the Justices, Bronson and Grace, said ". . . it is deemed proper to consider the merits of the issues raised concerning the constitutionality of the Workmen's Compensation Act, . . . ," the majority did not agree. Justice Birdzell said: ". . . a majority of the court does not adopt any opinion as expressing the views of the court . . . ." Chief Justice Christianson concurred specially in only a dismissal of the petition and Justice Robinson, in dissenting, expressed the view that the definition of hazardous employment, with the exceptions, is "absurd" and violates both Sections 61 and 11 of the North Dakota Constitution. It appears that the opinion of Justices Bronson and Grace rested, for the most part, on the question whether the classification of bookkeeper-clerk-typist was, "as a matter of law," nonhazardous. The proceedings were original in the Supreme Court and there was no testimony or affidavits supporting a conclusion on the hazardousness of that classification. The opinion, authored by Justice Bronson and concurred in by Justice Grace, at 175 N.W. at 379, stated:

"The fact that the act excludes from its operation domestic and agricultural employes, as well as railroad employes, does not give rise to the constitutional objection of unreasonable and arbitrary dis-

crimination *as a matter of law*. The fact that the entire field subject to regulation has not been covered is not fatal. What trades and occupations may be regulated is *ordinarily* a matter for the Legislature, *in the absence of a distinctive showing* of an unreasonable and arbitrary discrimination or classification. Similar exclusions in other Compensation Acts have been upheld. [Cites omitted.]" [Emphasis supplied.]

We cannot escape the conclusion that this court, in *Hagan*, failed to decide the constitutionality of any part of the Workmen's Compensation Act and, specifically, failed to decide the validity of the agricultural exclusion. Even if it was contended that the constitutional issue was decided in *State v. Hagan, supra*, we would not be thereby prohibited from again examining the issue in this case. See *Melland v. Johanneson*, 160 N.W.2d 107, 112 (N.D.1968). As we said in *Johnson v. Hassett*, 217 N.W.2d 771, 779 (N.D.1974):

"In constitutional law, as in other matters, times change and doctrines change with the times."

We also stated in that opinion, at 777: "Even when a statute has been in effect for a long time, our duty to consider its constitutionality, when the matter comes before us, continues, and this duty has been performed even in the face of prior holdings of constitutionality."

### Recent Montana and Michigan Cases

Courts from Montana and Michigan have been the most recent to have considered at least some of the aspects of an agricultural exclusion from workmen's compensation statutes. Both courts expressed some general principles with which we agree.

In *State ex rel. Hammond v. Hager*, 160 Mont. 391, 503 P.2d 52 (1972), the Montana Supreme Court was urged to ignore *New York Central R. Co. v. White, supra*, because there the issues were not considered head on, but only obliquely. The United States Supreme Court had used the terms "patent, simple and familiar" in describing agricultural employment, leaving the infer-

ence that that was the basis for justifying the agricultural exclusion. The majority of the Montana court did not indicate any disagreement with Hammond's criticism of *White*, nor with its contention that farming in Montana is not, in these days, *patent, simple* and *familiar*. The Montana court held that Hammond failed to overcome the strong presumption of constitutional validity and that it failed to "negative every conceivable basis which might support it." Two of the Montana justices concurred specially, contending that there was no constitutional issue properly before the court. Because no state constitutional violation was asserted, there apparently was no reason for the court to discuss whether or not an intermediate standard of scrutiny is available in Montana. When the United States Supreme Court on appeal dismissed "for want of substantial federal question," without explanation, it missed an opportunity to clarify a confused legal problem. See *Hammond v. Hager*, 411 U.S. 912, 93 S.Ct. 1548, 36 L.Ed.2d 303 (1973).

Holding that an agricultural exclusion in the Michigan Workmen's Compensation Act was discriminatory to persons thereby excluded, the Michigan Supreme Court in *Gutierrez v. Glaser Crandell Company*, 388 Mich. 654, 202 N.W.2d 786 (1972), reversed a Michigan Court of Appeals' holding in *Gallegos v. Glaser Crandell Company*, 34 Mich.App. 489, 192 N.W.2d 52 (1971). The Michigan Supreme Court made no comments upon its previous, contrary holding in *Mackin v. Detroit-Timkin Axle Co.*, 187 Mich. 8, 153 N.W. 49 (1915), which, in upholding the exclusions from workmen's compensation coverage, stated:

"The law is unquestionable that it is within the power of the Legislature to classify both employers and employes, if the classification is not fanciful or arbitrary and for reasons of public policy, is based upon substantial distinctions, is germane to the object sought to be accomplished by the act, not limited to existing conditions only, and applies impartially and equally to each member of the class." *Mackin v. Detroit-Timkin Axle Co.*, supra, 153 N.W. at 55.

In *Gutierrez,* out of the seven Michigan justices, four (Adams, T. M. Kavanagh, C. J., Black and Swainson) concluded that:

"There is no basis for distinguishing the work of a laborer who drives a truck at a factory from a laborer who drives one on the farm or for any one of numerous other labor activities 'on the farm' as distinguished from the same activity in industry, wholesaling, retailing, or building. . . .

. . . . .

"If the argument is that this creates special benefits for a class of agricultural workers . . . then it is clearly discriminatory as to all other employees . . . If the argument is that the benefits are illusory since the class created is next to non-existent, then the exclusions . . . are all the more to be condemned.

"Finally, the argument that Section 115(e) is especially tailored to meet the problems of the small farmer and his occasional employees fails to account for the need for similar treatment as to the small businessman—grocer, clothier, butcher—or as to the small contractor—plumber, carpenter, roofer—or as to numerous other categories of small employers and their employees who are not accorded this treatment." *Gutierrez v. Glaser Crandell Company, supra,* 202 N.W.2d at 791.

These four justices were not only concerned about a subclassification of agricultural *employees* but found that the special benefit to agricultural *employers* was impermissible, clearly discriminatory, and unsupported by any rational basis.

Justice T. G. Kavanagh, when applying the rational-basis standard, concluded that there is a rational basis for distinguishing between agricultural and nonagricultural employees but, by applying a modified, substantive, due-process type of test, found the exclusion of a subclassification of agricultural workers invalid on the basis that "the existence of a permissible purpose cannot sustain an action that has an impermissible effect." See *Gutierrez v. Glaser Crandell*

*Company, supra,* 202 N.W.2d at 793, and *Wright v. Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972).

Justice Williams agreed with Justice T. G. Kavanagh that the subclassification violated equal protection and found it "altogether unreasonable and lacking in rational basis." He further agreed with the principle that the *effect* of a statute in combination with other factors may be the basis for applying the same standard of close scrutiny ordinarily associated with suspect classification. Justice Williams asserted that there were not sufficient facts to establish a suspect classification.

Justice Brennan dissented, finding no discrimination. None of the justices concluded that there was an "inherently suspect" class even though the plaintiffs were Hispanic. None of the justices labeled it a "fundamental" right violated. In the light of these circumstances, Justice T. G. Kavanagh's statement appears significant:

"A court is not confined to a sterile examination of the statute itself but must look to its effect. [Footnote omitted.] Such effect alone may dictate a finding that equal protection has been denied. This is true because when a classification is made by a statute we must look first to its reasonableness and then to its effect—direct and indirect. If the effect is direct we have little trouble in determining discrimination. If the direct effect is not constitutionally offensive however, we must look for any indirect effect. An indirect effect is no more legitimate than a direct effect, and we must assay the effect apart from the purpose. 'The existence of a permissible purpose cannot sustain an action that has an impermissible effect.' [Footnote omitted.]" *Gutierrez v. Glaser Crandell Company, supra,* 202 N.W.2d at 793.

We can only conclude that the Michigan Supreme Court has applied an intermediate standard of review which involves the rational basis to the extent applicable, and the strict-scrutiny standard where applicable.

Although this court desires to portray an image of intellectual vitality and to display its capacity to identify and evaluate each analytically distinct ingredient of the contending interests, we have a legacy of judicial restraint which we should not cavalierly abandon.

Use of judicial restraint, however, does not permit a court to ignore its responsibility. If taken too literally, the rule that a court will not substitute its judgment for that of the legislature could result in the abdication by the court of any authority to review the constitutionality of legislation. The ultimate result would be a destruction of the constitution as a limitation on legislative action. The pendulum could likewise swing too far the other way and the court could become so aggressively creative that the judge's notions as to what is good or bad or necessary or unnecessary could improperly restrict policy-making functions of the legislative branch.

### The Stated Purpose of the Act

■ Government could not function without making classifications. The discriminatory effects of classification ordinarily do not violate equal protection as long as there is a basis for disparate treatment that naturally inheres in the subject matter. See *Caldis v. Board of County Commissioners, supra,* 279 N.W.2d at 670. Any classification can be challenged as denying equal protection; it then becomes the duty of the court to determine the statute's validity and to uphold the classification if it includes all, and only those, persons who are similarly situated with respect to the purpose of the law. See *Ferch v. Housing Authority of Cass County,* 79 N.D. 764, 59 N.W.2d 849, 864 (1953); *Developments in the Law— Equal Protection,* 82 Harvard L.Rev. 1065, 1076 (1969, Part 2).

Generally, when the legislature has expressed the *purpose of the law,* courts need only examine the statute itself in determining whether or not: (1) a particular classification bears some rational relationship to the expressed purpose; (2) the classification is based upon a permissible distinction (that

is, are similar things treated similarly); and (3) the classification is clearly arbitrary or unreasonable.

■ The North Dakota Legislature explicitly expressed the purpose of the Act but the exclusion of agricultural services has no correspondence to that expressed purpose. The legislature made no attempt to express any purpose for the exclusion. When the legislature fails to express a purpose for an enactment, the court will ordinarily attribute a purpose which is consistent with the provisions of the enactment and which is the most probable legislative purpose. See *Development in the Law— Equal Protection, supra,* 82 Harvard L.Rev. at 1077, which says: "To this end the court may properly consider not only the language of the statute but also general public knowledge . . . ."

### The Purpose of the Agricultural Exclusion

The record in this case contains a considerable amount of material relating to the subject of the agricultural exclusion and, together with numerous writings (see e. g., 1B Larson, *Workmen's Compensation Law, Farm Labor,* § 53), compels the conclusion that the purpose for the exclusion of agricultural services was not for the benefit of the employees but for the employers. This double-pronged exclusion, the agricultural employer and the agricultural employee, complicates analysis of the constitutional question. The exclusion of the agricultural *employer* appears to have been the focus of most of the cases that we have analyzed. North Dakota, being the most agricultural of all states, has never hesitated to grant to agriculture, as its most important industry, legislative preferences. A cursory analysis of one title of the North Dakota Century Code (Title 39) discloses seventeen readily identifiable exemptions for agriculture and a number which are not readily recognizable but are preferences in fact. This type of preference has been upheld whenever it has been challenged. See e. g., *Figenskau v. McCoy,* 66 N.D. 290, 265 N.W. 259 (1936). The agricultural exclusion violates none of the restrictions placed upon legislation by

the constitution insofar as it results in a benefit to agricultural *employers* that are not enjoyed by other industries. A subsidized agriculture appears to have been accepted as inherent under our economic system.

The other prong of this exclusion requires that we focus upon the agricultural employee. There are four possible purposes for excluding agricultural employees from the benefits offered other employees by the Workmen's Compensation Act:

(1) *The purpose of excluding agricultural employees was to overcome political opposition to passage of a workmen's compensation act by a farm-oriented legislature.*

"Legislatures were quick to perceive that farmers would oppose such increased liability, and that they would not insure their hired help. . . . There were many individual and small farmers in the early twentieth century, not only on the farms, but as members of the legislatures in legislative halls, and it was feared that extension of the compensation acts to them would defeat the proposed bills. Exceptions were therefore made for farmers and farm laborers.

. . . . .

"One legislature followed the other in incorporating the exception, an exclusion with hollow but happy sound which echoed its way across the country, leaving in its wake only confusion and disaster for injured farm workers." Horovitz, *Injury and Death Under Workmen's Compensation Laws*, "Employees and Employers," pp. 214, 215 (1944), Wright & Potter Printing Co., Boston, Mass.

In the beginning of such legislation, political expedience may have justified the exclusion under the doctrine that reform may take one step at a time. But, in the light of the passage of time, changed conditions, and the expressed purpose of the Act, that cannot justify the exemption forever. See *State v. Gamble Skogmo, Inc.*, 144 N.W.2d 749, 760 (N.D.1966), quoting from *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). See also, *City of Bismarck v. Materi*, 177

N.W.2d 530 (N.D.1970), and *Tharaldson v. Unsatisfied Judgment Fund, supra,* 225 N.W.2d at 46. Now that sixty years have passed and almost everything in life has changed, and farmers have experienced legal difficulties in the form of common-law tort claims, it appears that reconsideration of the agricultural exclusion is overdue. See *Rosebear v. Anderson*, 143 F.Supp. 721 (D.N.D.1956), 245 F.2d 673 (8th Cir. 1957), not as a decision supporting our reasoning in this case but as an indication that farmers may, and do, suffer common-law tort claims.

When we focus upon the employee, this purpose, if we can call it that, only supports a conclusion that agricultural employees had little influence in legislative matters, but supplies no justification for the exclusion in a constitutional sense.

(2) *Farm employees should be excluded because their work is not as hazardous as other employment and compulsory coverage for them is not needed.*

"Least convincing of all is the assertion that farm laborers do not need this kind of protection. Whatever the compensation acts may say, agriculture is one of the most hazardous of all occupations. In 1964, of 4,761,000 agricultural workers, 3,000 were fatally injured, while of 17,-259,000 manufacturing employees, the number of fatalities was 2,000." 1B Larson, *Workmen's Compensation Law, Farm Labor*, § 53:20, p. 9–109.

With advanced technology and increasing mechanization, farming has become more dangerous. Of all occupations, only mining and construction are more hazardous than farming. Davis, *Death of a Hired Man— Agricultural Employees and Workmen's Compensation in the North Central States*, 13 S.D.L.Rev. 1 (1968); National Safety Council, *Accident Facts*, p. 85 (1965). See also, Medd, *Legal Problems of Migrant Agricultural Workers*, 50 N.D.L.Rev. 459 (1973–74).

The hazards inherent in farming have not escaped the notice of the judiciary and explain, in part, the reason for those cases in

which we have been urged to declare some farm activities to be nonagricultural, i. e., beekeeping—*Morel v. Thompson*, 225 N.W.2d 584 (N.D.1975); and livestock feeding—*Butts Feed Lots v. Board of Cty. Commissioners*, 261 N.W.2d 667 (N.D.1977). Some courts, even when faced with explicit statutory language, have resorted to fineline distinctions to avoid unjust results. In upholding an agricultural exclusion in *Roush v. Heffelbower*, 226 Mich. 664, 196 N.W. 185, 186 (1923), the court said:

> "In excluding farm laborers from the benefits granted to other classes, it was evidently the theory of the Legislature that the work of the farm laborer was not sufficiently hazardous to require the protection of the Compensation Law. As the danger incident to the operation of machinery used in threshing grain and husking corn is as great as that incident to the use of machinery in a factory or elsewhere, it was probably in the legislative mind that when a farmer was engaged in that business apart from his regular farming operations, he was not engaged in farming and his employees were not farm laborers. In no other way can the exclusion of farm laborers from the benefits of the statute be explained or justified."

A conclusion that modern-day farming is nonhazardous defies reality and provides no explanation for the exclusion of agricultural employees from coverage under the Act. It is readily acknowledged that driving cattle on horseback has not become more dangerous than it was in 1919, yet riders employed at sales rings and stockyards have always benefited from coverage while riders employed by farmers and ranchers have not.

(3) *Farm employees should be excluded because the "family farm" is a closely knit community of relatives and friends who care for each other's needs and injuries and no other protection is needed.*

The court, in *Sayles v. Foley*, 38 R.I. 484, 96 A. 340, 344 (1916), possibly had something like that in mind when it said:

> "As to domestic and agricultural employes, if the Legislature deemed the nature of their employment with, as a general rule, its intimate personal relations between the employer and his employes, to be such that it would be proper to leave them both as to remedies for personal injuries arising from accidents in the course of their employment to the common-law action and its defenses, we cannot say that such classification is arbitrary and unreasonable, as there is a substantial difference between the condition of these employes and those where the obvious risks of the employment are greater and where the mere number of employes permits little opportunity for actual acquaintance."

In this case, Benson's employer, Decker, testified in effect that he thought that he had private insurance that would have taken care of any employee accident. He did carry farm liability coverage which included $2,000 no-fault medical benefits, and these were, in fact, paid to Benson. Decker asserted that he discovered, after the accident, that the coverage he thought he had is not even available from commercial insurance carriers and that it would be "too costly" to carry voluntary workmen's compensation coverage. There may be farmers even more beneficent than Decker but there undoubtedly are many migrant, temporary, part-time employees who have no reason whatsoever to expect to be cared for, if injured, out of any beneficence of their farmer-employer.

(4) *Farm employees should be excluded because farm employers cannot afford to pay the premium.*

We accord this justification considerable weight and perceive more than an element of truth in it. Any addition to the overhead costs of operating a farm threatens the chances of a profitable operation. The latest edition of 1B Larson, Workmen's Compensation Law, § 53:10, indicates that not more than seventeen states have mandatory workmen's compensation coverage for agricultural workers. All other things being equal, there is a recognizable, competitive

edge for a farmer who is freed from any item of overhead cost.

There is also some validity in the argument that a great proportion of the North Dakota farmers who have family-size farms would be unduly burdened by the administrative inconvenience and expense of record keeping even though farmers are much more sophisticated now than in 1919. The Michigan court pointed out in *Gutierrez v. Glaser Crandell Company, supra*, 202 N.W.2d at 794:

"Defendant argues that the administrative burden placed upon the agricultural employer would be too great. However, such employer already must meet the requirements of withholding tax and social security to name just two."

If the legislature would base a classification on the record-keeping burden alone, it would be objectionable as underinclusive because there are family-size businesses that suffer the very same burden. Size of the operation is not a factor in the exemption any more than hazardousness of the activity.

Another of the economic factors that provides justification for a farm exemption is that, in our marketing system, a farmer, unlike a manufacturer, cannot add the costs of workmen's compensation premiums to the price for which he will sell his products. We acknowledged the validity of this factor in *Figenskau v. McCoy*, 66 N.D. 290, 265 N.W. 259, 263 (1936), where we said:

"It is a matter of common knowledge that under the present transportation and marketing system the cost of transportation of agricultural products from the farm to the market or to the railway station usually falls upon the farmer. He has no way of including the cost of transportation in the price which he receives for his products and thus passing it on to the purchaser. The cost of transportation is one of the handicaps of the farming industry in this state. The Legislature may have reasonably decided that, since the fee here considered adds to the cost of transportation between farm and market or at least between the farm and the railroad station, it should not impose a further transportation burden upon agricultural products. When considered in this light, the exemption is based upon a reasonable and distinguishable classification, and is not in conflict with the provisions of either the state or federal Constitutions."

We note that the cost of premiums is not incurred solely for the benefit of the employee. An agricultural employer, if covered by the Workmen's Compensation Act, would benefit by being relieved of the burden of defending possible common-law tort claims, especially in those cases where his negligence was the proximate cause of the injury to the employee.

We cannot ignore the effect of the exemption upon agricultural employees. We agree with that part of the *Gutierrez* opinion which said:

"A court is not confined to a sterile examination of the statute itself but must look to its effect." 202 N.W.2d at 793.

When we look at the effect of the agricultural service exclusion, we must focus upon both employer and employee and, although some inequality is permissible, we must balance the benefits against the burdens imposed on each class.

When a special benefit is granted by legislative enactment to a group and the resulting burden falls on the widest possible base, the balancing required is simple. Thus, for example, in situations wherein there is a claim that a tax benefit violates equal rights because those benefits are not available equally for all taxpayers, no balancing is required if the burden resulting from the special benefit falls on the public generally. See, e. g., *Caldis v. Board of County Commissioners, supra*, and *Signal Oil and Gas Company v. Williams County*, 206 N.W.2d 75 (N.D.1973). These are simple situations similar to those involving the licensing of a profession, regulating of activities that have a "vested public interest," or involve economic or political policy. See *State v. Knoefler*, 279 N.W.2d 658 (N.D. 1979).

As the United States Supreme court said in *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 173, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768, 777 (1972): "The essential inquiry . . . is . . . inevitably a dual one: What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?"

We believe that the courts can assist in the preservation of the legitimate concerns of the legislature for the interests of agricultural wage earners and for the well-being of those engaged as agricultural employers, without imposing any extreme burden upon either.

When the nature of the discrimination appears evident on the face of the statute—the imposition of the burden upon the broadest basis rather than the narrowest—a judicial review in the nature of "strict scrutiny" may be appropriate. See *Hughes v. Oklahoma,* —— U.S. ——, ——, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250 (1979), where the United States Supreme Court, in holding a statute of Oklahoma repugnant to the Commerce Clause, said:

> "Section 4–115(B) is certainly not a 'last ditch' attempt at conservation after non-discriminatory alternatives have proven unfeasible. It is rather a choice of the most discriminatory means even though nondiscriminatory alternatives would seem likely to fulfill the State's purported legitimate local purpose more effectively."

There would be no logic in concluding that rights of merchants to ship Oklahoma minnows in interstate commerce should be scrutinized differently from the right of an agricultural wage earner to be treated equally under the law. We find unacceptable the suggestion by the attorney general that by excluding farm workers from workmen's compensation coverage, the legislature has, in effect, spread the burden of injured farm workers to the widest possible base—to the taxpayers in general—because injured farm workers who are poor can receive welfare. The burden still rests entirely upon the injured farm employee, if not economically, surely in the loss of dignity.

### Conclusions

We agree with the trial court's conclusion that the exclusion of agricultural employees from the benefits of the Workmen's Compensation Act is unreasonable and contrary to the expressed purpose of the Act. Because of the exclusion, the Act withholds from agricultural employees the sure and certain relief awarded to other wage earners. There is no correspondence between the purpose of the Act and the agricultural classification. There are no proper and justifiable distinctions between agricultural employees and nonagricultural employees in relation to the risk of injury from employment.

Although the district court held that the statute here involved also violates Sections 1, 11, and 13 of Article I of the North Dakota Constitution and Section 1 of the Fourteenth Amendment to the United States Constitution, it is not necessary for the disposition of this case that we consider those matters. We hold that the agricultural exemption in the Workmen's Compensation Act violates § 20, Article I, North Dakota Constitution.

To the extent that *State v. Hagan, supra,* may be considered as upholding the validity of the agricultural service exemption, it is overruled.

### Prospective Application

In *Kitto v. Minot Park District,* 224 N.W.2d 795, 804 (N.D.1974), we said:

> "Consistent with what has been termed the Sunburst Doctrine [footnote omitted], state courts have, in recent cases, recognized and utilized prospective application of decisions as a means of avoiding injustice in cases of this type. Decisions have been applied prospectively to be effective as to causes of action arising at varying future dates. The particular rule of law may or may not be applied to the parties to the appeal. This approach provides the judicial branch with some much needed flexibility in dealing with questions

having widespread ramifications for per-sons not parties to the action."

*Accord, Walker v. Omdahl,* 242 N.W.2d 649 (N.D.1976).

Today's decision would undoubtedly have widespread and unknown ramifications for farmers in this State who have not volun-tarily elected to secure coverage under the Act. Similarly, significant adjustments in the Workmen's Compensation Bureau's ad-ministration of the Act are required, likely involving additional personnel as well as funding authorization. To permit time for adjustments by all concerned and so that the legislature may study this field of law and possibly amend the Workmen's Com-pensation Act to meet the criticisms of this opinion, we hold that this decision shall be applicable to the claim of Benson and to future claims arising out of injuries occur-ring to agricultural employees on and after July 1, 1981.

The judgment is affirmed * and the case is remanded for such further proceedings in the district court as may be necessary to facilitate the award of benefits to Elvin Benson by the Workmen's Compensation Bureau.

ERICKSTAD, C. J., and HEEN, District Judge, concur.

HEEN, District Judge, sitting in place of VANDE WALLE, J., disqualified.

SAND, Justice (dissent).

I respectfully dissent for the following reasons:

The cases cited in the majority opinion and the principles of law, as well as the rationale for which they stand, support rather than militate against the validity of § 65–01–02(4)(a)(1), North Dakota Century Code. Section 65–01–02(4)(a) provides as follows:

" 'Hazardous employment' shall mean any employment in which one or more em-ployees are employed regularly in the same business or in or about the estab-lishment except:

  (1) *Agricultural or domestic service;* or

  (2) Any employment of a common car-rier by railroad; or

  (3) Any employment for the transpor-tation of property or persons by nonresidents, where, in such trans-portation, the highways are not traveled more than seven miles and return over the same route within the state of North Dakota; or

  (4) All members of the clergy and em-ployees of religious organizations engaged in the operation, mainte-nance and conduct of the place of worship;" [Underscoring ours.]

The principal issue is whether or not subdi-vision (1), the agricultural exemption, is constitutional.

In every instance where this question was presented to a court it was upheld. How-ever, in *Gutierrez v. Glaser Crandell Com-pany,* 388 Mich. 654, 202 N.W.2d 786, 792 (1972), the court held invalid a classification within a classification relating to employees engaged in agricultural activities. The le-gal rationale parallels the case of *Melland v. Johanneson,* 160 N.W.2d 107 (N.D.1968), where the court declared unconstitutional § 54–03–21, NDCC, which prohibited state legislators from doing business with the state in excess of $10,000 per calendar year. But other than this Michigan case, every court has upheld the exemption and, for that matter, every court has upheld a simi-lar exemption or exclusion in the Unem-ployment Compensation Act relating to ag-ricultural services. Even the Michigan court of appeals, in the case of *McDonald v. Chrysler Corporation,* 68 Mich.App. 468, 242 N.W.2d 810 (1976), held that the workmen's compensation statute which granted conclu-sive presumption of dependency to a wife living with a workman on the date of injury

---

\* ADDENDUM—Since the concurrence of four members of this Court is required to declare a statute unconstitutional (Section 88, North Da-kota Constitution), and only three members of the Court concur in this opinion, the agricultur-al exclusion from the Workmen's Compensa-tion coverage is not declared unconstitutional by a sufficient majority. See *State ex rel. Ol-son v. Maxwell,* 259 N.W.2d 621, 629 (N.D. 1977).

but the widow of the deceased workman living apart for justifiable cause was granted conclusive presumption of dependency did not deprive wives of equal protection of law on the basis that public policy permits special legislation if the state is to maintain an attitude of solicitude toward widows, and on the basis that it is the only source of competent nonhearsay testimony as to the issue of justifiable cause for living apart. This illustrates that even in matters of subclassification the court will uphold it if there is some justifiable basis, but in the issue before us we are not involved with a subclassification and it is therefore not necessary that the state establish justification for its enactment. The reverse is true. The one seeking to have the statute declared invalid has the burden of establishing that there is no justification for the enactment.

Numerous court decisions concerned with this topic and the case law, together with the legal rationale, as well as the cases cited in support of the decision overwhelmingly support the validity of the agricultural service exclusion from the Workmen's Compensation Act.

In *New York Central R. Co. v. White*, 243 U.S. 188, 37 S.Ct. 247, 254, 61 L.Ed. 667 (1917), the Court upheld the validity of the exemption of agricultural employees in the New York Act.

The Workmen's Compensation Act, Unemployment Compensation Act, and Minimum Hours and Wages Act were challenged in *Doe v. Hodgson*, 478 F.2d 537, *cert. denied* 414 U.S. 1096, 94 S.Ct. 732, 38 L.Ed.2d 555, and was upheld by the three-judge court. The court relied heavily upon *Romero v. Hodgson*, 319 F.Supp. 1201 (D.C. 1970), in which the exclusion of agricultural labor from the Unemployment Compensation Act was challenged. *Romero* was summarily affirmed by the United States Supreme Court in 403 U.S. 901, 91 S.Ct. 2215, 29 L.Ed.2d 678 (1971). The Court in *Romero* noted that:

"The law of equal protection has undergone many changes in the past half century, and most important of these is, perhaps, the standard of deference to the legislature which came out of the turbulent thirties and which remains strong today. While many cases have shown the judiciary highly suspicious of legislative classifications which abridge what are called 'fundamental' or 'constitutional' rights, every presumption has run in favor of upholding the laws which deal with regulation of the economy, the public health, or the collection and disbursement of taxes."

The court also said:

"When the legislature chooses to inaugurate a reform as sweeping as that which is represented by unemployment compensation, it is often forced to make compromises which, whether in the name of politics or economy, are often impossible of explanation in strictly legal terms. Realizing this, the Courts have refused to require that the State remedy all aspects of a particular mischief or none at all. Developments in the Law; Equal Protection, 82 Harv.L.Rev. 1065, 1084–87 (1969). See also *Gonzales v. Shea*, 318 F.Supp. 572 (D.C.1970)."

The so-called change of times, as stated in the majority opinion, is not in harmony with the above case.

This is not the first time that this question has been before this court. In *State v. Hagan*, 44 N.D. 306, 175 N.W. 372, 379 (1919), this court said:

"The fact that the act excludes from its operation domestic and agricultural employes, as well as railroad employes, does not give rise to the constitutional objection of unreasonable and arbitrary discrimination as a matter of law. The fact that the entire field subject to regulation has not been covered is not fatal. What trades and occupations may be regulated is ordinarily a matter for the Legislature, in the absence of a distinctive showing of an unreasonable and arbitrary discrimination or classification. Similar exclusions in other Compensation Acts have been upheld."

There was one dissent, but three concurrences with the author. The only reasona-

ble conclusion that can be determined from *State v. Hagan* is that the court upheld the exclusion. In my opinion, it requires forceful, compelling reasons to reverse the former decision, particularly in matters of constitutionality where an act has a strong presumption of validity.

The exclusion of farm laborers and domestic service in the Texas Workmen's Compensation Act was challenged in *Middleton v. Texas Power & Light Co.,* 249 U.S. 152, 157, 39 S.Ct. 227, 229, 63 L.Ed. 527 (1919). The Court, in upholding it, said:

"However, we are clear that the classification can not be held to be arbitrary and unreasonable. The Supreme Court of Texas, in sustaining it said (108 Tex. 96, 110, 111, 185 S.W. 556): 'Employees of railroads, those of employers having less than five employees, domestic servants, farm laborers and gin laborers are excluded from the operation of the act, but this was doubtless for reasons that the Legislature deemed sufficient. The nature of these several employments, the existence of other laws governing liability for injuries to railroad employees, known experience as to hazards and extent of accidental injuries to farm hands, gin hands and domestic servants, were all matters no doubt considered by the Legislature in exempting them from the operation of the act. Distinctions in these and other respects between them and employees engaged in other industrial pursuits may, we think, be readily suggested. We are not justified in saying that the classification was purely arbitrary.'

"There is a strong presumption that a Legislature understands and correctly appreciates the need of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds."

The court further stated:

"The exclusion of farm laborers and domestic servants from the compulsory scheme of the New York Workmen's Compensation Act was sustained in *New York Central R. R. Co. v. White,* 243 U.S.

188, 208, 37 S.Ct. 247, 229, 61 L.Ed. 667, [677,] . . . upon the ground that the Legislature reasonably might consider that the risks inherent in those occupations were exceptionally patent, simple, and familiar. The same result has been reached by the state courts generally. *Opinion of Justices,* 209 Mass. 607, 610, 96 N.E. 308, [1 N.C.C.A. 557;] *Young v. Duncan,* 218 Mass. 346, 349, 106 N.E. 1; *Hunter v. Colfax Consol. Coal Co.,* 175 Iowa 245, 154 N.W. 1037, 287, L.R.A. 1917D, 15, Ann.Cas.1917E, 803, [11 N.C. C.A. 886;] *Sayles v. Foley,* 38 R.I. 484, 490–492, 96 A. 340, [12 N.C.C.A. 949]. Similar reasoning may be applied to cotton gin laborers in Texas; indeed, it was applied to them by the Supreme Court of that state, as we have seen. And the exclusion of domestic servants, farm laborers, casual employees, and railroad employees engaged in interstate commerce was sustained in *Mathison v. Minneapolis Street R. Co.,* 126 Minn. 286, 293, 148 N.W. 71, L.R.A.1916D, 412, [5 N.C. C.A. 871]."

The exclusion of farming and ranching from the Workmen's Compensation Act was challenged in *State of Montana ex rel. Hammond v. Hager,* 160 Mont. 391, 503 P.2d 52 (1972). In ruling that the exclusion was not arbitrary and unreasonable, the Montana Supreme Court took into consideration the expressions of the United States Supreme Court on the same subject and related subjects as to classifications and took note of what the United States Supreme Court said in *Madden v. Kentucky,* 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590, 593:

"Since the members of a legislature necessarily enjoy a familiarity with local conditions which this court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative

arrangement to negative every conceivable basis which might support it."

The Montana court continued;

"Under these circumstances, the rule that an act of the Legislature will not be declared invalid because it is repugnant to some provision of the Constitution, unless its invalidity is made to appear beyond a reasonable doubt, applies with particular force.

. . . . .

"Our legislature might have concluded to exclude farming operations because they were hazardous enough that the cost of coverage to the farmer would be an unnecessary and unreasonable burden, particularly since the legislature may not have believed that conditions of farm employment generally were similar to those of the industries the Act did cover.

"Speculating further, one could as well conclude that the legislature excluded coverage of farmers on the basis, for example, that a great majority of Montana farmers employ too few people to justify the cost and administrative expense required to comply with the Act; that most farm employees are too seasonal or casual to require coverage; or, that Montana's farmers should not be put at a competitive disadvantage since most other states also exclude agriculture."

The court also stated that the person seeking to invalidate the act has the burden to "negative every conceivable basis which might support the legislative action."

I believe it is common knowledge, or at least well established, that a farmer is not able to pass on the costs to the purchaser or consumer, as is the situation in other commercial enterprises and business. The farmer is required to absorb any additional costs himself. This constituted the basis for a statute excluding classification of agricultural products from the statutory definition of commercial trading in *Figenskau v. McCoy*, 66 N.D. 290, 265 N.W. 259 (1936). To this should be added that it is common knowledge for farmers to exchange help, particularly with the family farm. Added to this is the further knowledge that minor members of the family, as distinguished from other businesses, perform work as part of the "growing up process" without any given salary, and also exchange services with other family farms. While other businesses also have members of the family working, in most instances they are adults and not minors, as the situation is on the farm.

In *Lucas v. State Industrial Accident Commission*, 222 Or. 420, 353 P.2d 223, the Supreme Court of Oregon in 1960 held valid an act which exempted relatives and members of the family from the Workmen's Compensation Act unless the employer gave notice to the Commission before the injury. It is reasonable to assume that the legislature in excluding agricultural employees was aware that many farms had members of a family or relatives working on the farm, particularly exchange of help, etc., and that the problem of policing the Workmen's Compensation Act would be monumental and too costly and therefore provided for the exclusions.

The majority opinion has not pointed to one single factor why the act is invidiously discriminatory. It simply states so without any support whatsoever. The exclusion does not fall within the suspect class, therefore the need to support the act is not present but it is up to the challengers to clearly illustrate and demonstrate that the act amounts to an invidious discrimination. This has not been done.

We might well, at this point, note what Justice Cardozo had to say in The Nature of the Judicial Process 141 (1921):

"The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure, He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' Wide enough in all the con-

science is the field of discretion that remains."

Chief Justice Burger, in *United Steelworkers of America v. Weber et al., Kaiser Aluminum & Chemical Corporation v. Weber* and *United States et al. v. Weber,* ——— U.S. ———, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), said:

"What Cardozo tells us is beware the 'good result,' achieved by judicially unauthorized or intellectually dishonest means on the appealing notion that the desirable ends justify the improper judicial means. For there is always the danger that the seeds of precedent sown by good men for the best of motives will yield a rich harvest of unprincipled acts of others also aiming at 'good ends.' "

I cannot improve upon this when I consider what the majority opinion is attempting to do without any judicial basis, rationale, or justification.

The United States Supreme Court, in *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, Chief Justice Warren said that:

". . . The Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

In this same case Justice Frankfurter quoted from *McCray v. United States*, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, wherein the Court said:

"The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted."

He also quoted from *Sonzinsky v. United States*, 300 U.S. 506, 57 S.Ct. 554, 81 L.Ed. 772; *Veazie Bank v. Fenno*, 8 Wall. 533, 19 L.Ed. 482; *Arizona v. California*, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154; *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487, wherein the court said:

"Inquiry into the hidden motives which may move [a Legislature] to exercise a power constitutionally conferred upon it is beyond the competency of courts."

Justice Frankfurter said further:

"Neither the Due Process nor the Equal Protection Clause demands logical tidiness. *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 33 S.Ct. 441, 57 L.Ed. 730. No finicky or exact conformity to abstract correlation is required of legislation. The Constitution is satisfied if a legislature responds to the practical living facts with which it deals. Through what precise points in a field of many competing pressures a legislature might most suitably have drawn its lines is not a question for judicial re-examination. It is enough to satisfy the Constitution that in drawing them the principle of reason has not been disregarded. See *Goesaert v. Cleary*, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163. And what degree of uniformity reason demands of a statute is, of course, a function of the complexity of the needs which the statute seeks to accommodate."

These principles of law have full application to the question under consideration here.

A similar observation and statement was made in *Lindsey v. Normet* by the United States Supreme Court, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36, wherein it said:

". . . a State is 'presumed to have acted within [its] constitutional power despite the fact that, in practice, [its] laws result in some inequality."

We frequently talk about separation of powers, the executive, the legislative, and the judicial, and that each must respect the

separate but equal branches of government. The majority opinion is clearly without any reservation proposing legislation and is, in fact, taking the position of the legislature. If we are going to maintain this respect for the three branches of government it is important that we, the members of the judiciary, refrain from intruding upon the legislative function and also from declaring a legislative act unconstitutional unless it is done pursuant to the long-standing principles and concepts of constitutional law.

For further authority on the validity of the exemptions of farm laborers, and, for that matter, any classification, see 16A C.J.S. *Constitutional Law* § 497, pp. 275 and 276, as well as 81 Am.Jur.2d *Workmen's Compensation* § 17. If you examine these authorities you will find that not one court where this question has been brought before it has declared it unconstitutional. All of the courts, and there are a sizable number, have held the exclusion valid. We may not, and should not, act as a super legislative body. If members of the judiciary want to enter the field of legislation there are ways to accomplish that and that is the way it should be done, but not by judicial fiat.

Because the Unemployment Compensation Act is in so many areas similar to the Workmen's Compensation Act, and the same constitutional principles of law apply, it is well to observe what courts have said with reference to the exclusion of farm laborers from the Unemployment Compensation Act. In *Halabi v. Administrator, Unemployment Compensation Act,* 171 Conn. 316, 370 A.2d 938 (1976), the court said:

"The approach to equal protection claims is substantially the same under both the federal and state constitutions. [Citations omitted.] Equal protection rights do not 'prevent the legislature from dealing differently with different classes of people. It means only that classifications must be based on natural and substantial differences, germane to the subject and purpose of the legislation, between those within the class included and those whom it leaves untouched.' [Citations omitted.] And, 'it has long been settled that a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment [of the United States Constitution] if any state of facts reasonably can be conceived that would sustain it.' *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 528, 79 S.Ct. 437, 441, 3 L.Ed.2d 480; *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491; *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393."

Another unemployment compensation exclusion was considered in *Davoren v. Iowa Employment Security Commission,* 277 N.W.2d 602 (Iowa 1979). In upholding the constitutionality of the exclusion, the Iowa court said:

"The nature of the burden upon one attacking a statute on equal protection grounds depends upon whether the classification is one subject to close judicial scrutiny or traditional equal protection analysis. Since the classification here is not based upon sex, race, alienage or national origin and does not involve fundamental rights, it is subject to the traditional equal protection standard. [See *Frontiero v. Richardson,* 411 U.S. 677, 681, 93 S.Ct. 1764, 1768, 36 L.Ed.2d 583, 589 (1973).] Under that test the classification must be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate governmental interest. Id. It does not deny equal protection simply because in practice it results in some inequality; practical problems of government permit rough accommodations; and the classification will be upheld if any state of facts reasonably can be conceived to justify it. [*Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501–502 (1970).] The legislature has wide discretion in deciding classifications. [*Cedar Memorial Park Cemetery Association v. Personnel Association, Inc.,* 178 N.W.2d 343, 350 (Iowa 1970).] Our view of the wisdom of the legislation is irrelevant. [*Peel v. Burk,* 197 N.W.2d 617, 619 (Iowa 1972).]"

In *Varela v. Mounho,* 92 N.M. 147, 584 P.2d 194 (App.1978), the court had under consideration a similar situation in which the constitutionality was approached indirectly. The court stated that asserted unfairness to farm laborers by exclusion of farm laborers from coverage under the workmen's compensation act is a matter of legislative policy. This observation applies here. For further authorities on exclusion of farm labor under the unemployment compensation act see 76 Am.Jur.2d *Unemployment Compensation* § 29, p. 909 and following pages.

I pose the question: If this court concludes that the farm labor exclusion is unconstitutional, then by what legal means can the exclusion for domestic service, and workers for religious organizations be exempt? I see no difference in any basic legal principles applied to any of them. Further than that, how can the unemployment compensation act which excludes farm laborers be held valid if this particular classification and exclusion is held to be invalid and unconstitutional.

Also, on the question of classification, the Supreme Court in *Ideal Bakery v. Schryver,* 43 Wyo. 108, 299 P. 284 (1931), had under consideration the question whether or not bakery kitchen which employed machines could be validly included in the workmen's compensation act as extra-hazardous operation. The court held it was a valid classification, and on page 294 of 299 P. said:

"The authority of the state to classify employees in groups identified by the business of the employer, without regard to whether the employee is exposed to the special hazards of the employer's business, has been upheld by the Supreme Court of the United States. *Louisville & Nashville Railroad Co. v. Melton,* 218 U.S. 36, 30 S.Ct. 676, 54 L.Ed. 921, 47 L.R.A., N.S., 84; *Mobile, Jackson & Kansas City Railroad Co. v. Turnipseed,* 219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78, 32 L.R.A., N.S., 226, Ann.Cas. 1912A, 463. The act is not subject to constitutional objection."

In *Horst v. Guy,* 211 N.W.2d 723 (N.D. 1973), the court had under consideration the legislative definition of a resident of North Dakota which excluded veterans who served on continuous active duty for fifteen or more years immediately prior to August 5, 1964, and who had not established an actual abode in North Dakota prior to March 29, 1971, the effective date of the "bonus" Act. On page 730, the court took notice and recited the appropriate provisions of the State Constitution, including Section 20, and the Fourteenth Amendment to the United States Constitution. The court then set forth the following rules:

"1. The Fourteenth Amendment to the United States Constitution permits the states a wide scope of discretion in enacting laws which affect some groups of citizens differently than they affect others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective.

"2. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.

"3. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

"5. Only invidious discrimination is prohibited by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

"6. Neither the Due Process Clause nor the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution demands logical tidiness. No finicky or exact conformity to abstract correlation is required of legislation. The Constitution is satisfied if a legislature responds to the practical living facts with which it deals. Through what precise points in a field of many competing pressures a legislature might most suitably have drawn its lines is not a question for judicial re-examination. It is enough to satisfy the Constitution that in drawing them the principle of reason has not been disregarded, and what degree of uniformity reason demands of a statute is a function of the complexity of the needs which the statute seeks to ac-

commodate." ¶¶ 1, 2, 3, 5, and 6 of the syllabus, *State v. Gamble Skogmo, Inc.*, 144 N.W.2d 749 (N.D.1966).

"5. Sections 11 and 20 of the North Dakota Constitution and § 1 of the fourteenth amendment to the United States Constitution do not prohibit or prevent classification, provided such classification is reasonable for the purpose of legislation, is based on proper and justifiable distinctions considering the purpose of the law, is not clearly arbitrary, and is not a subterfuge to shield one class or to burden another or to oppress unlawfully in its administration." ¶ 5 of the syllabus from *Melland v. Johanneson*, 160 N.W.2d 107 (N.D.1968).

"In the instant case the purpose of the legislation in question is to compensate North Dakota veterans of the Vietnam Conflict in appreciation for their services rendered to their State and country. The intent is to compensate only residents of North Dakota; this is a valid legislative intent as there is no reason for the citizens of North Dakota to compensate residents of other States."

In *Horst v. Guy*, 219 N.W.2d 153 (N.D. 1974), the court again had under consideration the bonus question. At this time the question was on the regulation which had been in effect and which, amongst other things, provided that the veteran must have been completely separated from continuous active duty after which he must have returned to North Dakota and re-established his home in the State of North Dakota prior to the effective date of the Act, March 29, 1971. The validity of the regulation was upheld, but before doing so the court took specific notice that a regulation, as a statute, is entitled to a reasonable presumption of constitutionality. A reading of these two cases leaves the unmistakable impression that the court gave serious consideration to the statute and rule which had been of long standing, and that no showing had been made that either one was invalid or unconstitutional.

On the subject of classification as it may involve the educational system which, in my opinion, as to importance, ranks way on top and one would believe no discrimination of any kind would be permitted. Yet the United States Supreme Court in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), upheld the challenge claiming that the Texas school financing system discriminated on the basis of wealth and was unconstitutional under the equal protection clause. Before the court reached its conclusion, it particularly drew a distinction between those privileges and rights specifically granted under the constitution and those which are not. The Court said:

"A century of Supreme Court adjudication under the Equal Protection Clause affirmatively supports the application of the traditional standard of review, which requires only that the State's system be shown to bear some rational relationship to legitimate state purposes."

The Court further said:

"Since the members of the Legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the *most explicit demonstration that a classification is hostile* and oppressive discrimination against particular persons and classes." [Underscoring mine.]

The case of *Liggett Co. v. Baldridge*, 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204 (1928), is important for two reasons: the United States Supreme Court in 1928 applied a far too strict a test on the regulation of pharmacy outlets (stores). The United States Supreme Court later reversed itself in *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 94 S.Ct. 407, 414, 38 L.Ed.2d 379 (1973). This supports the proposition that the United States Supreme Court allows state legislatures greater latitude in developing classifications and regulations of businesses. Of equal importance is that the North Dakota Supreme Court stated that it felt bound by the earlier United States Supreme Court decision in concluding that § 43–15–35(5), NDCC, violated the due process clause of

§ 1 of the Fourteenth Amendment to the United States Constitution in the case of *Snyder's Drug Stores, Inc. v. North Dakota State Board of Pharmacy*, 202 N.W.2d 140 (N.D.1972). It is interesting to note that in this instance there is no expression that it is bound by any of the United States Supreme Court decisions even though they are claiming that the act is unconstitutional under the Fourteenth Amendment, which is contrary to at least two United States Supreme Court decisions mentioned earlier herein. Does this mean that this court can pick and choose at its pleasure without any regard for judicial precedent? It would seem so.

Significantly, in the *Snyder's Drug Store* case, 219 N.W.2d 140, this court stated:

"It is also well established that a classification although discriminatory is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it. *Rast v. Van Deman & Lewis*, 240 U.S. 342, 36 S.Ct. 370, 60 L.Ed. 679 (1916); *New York Rapid Transit Corp. v. City of New York*, 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024 (1938). Furthermore, a court need not know the special reasons, motives, or policies of a State legislature in adopting a particular classification, so long as the policy is one within the power of the legislature to pursue, and so long as the classification bears a reasonable relation to those reasons, motives, or policies.' *Signal Oil and Gas Company v. Williams County*, 206 N.W.2d 75 at 83 (N.D.1973)."

In *Hospital Services v. Brooks*, 229 N.W.2d 69 (N.D.1975), this court held unconstitutional a statute which placed the responsibility and liability upon the children of their parents' care at the State Hospital without regard to any other criteria. The responsibility arose because of birth and no other reason. Also, the son or daughter sued had no recourse against any brother or sister. The claim by the State was on an arbitrary basis and rested primarily upon who had the money. The author of the majority opinion in this case dissented, and said:

"Legislative enactments are entitled to every presumption or constitutionality and such presumption should prevail unless it is shown that it is manifestly violative of organic law. The challenger has the burden of proving that the statute does not apply uniformly within a class of persons or that the class is based upon an unreasonable distinction or that it is an unnatural classification. [Citations omitted.] It appears to me that the trial court, and the majority opinion, places the burden on the appellant, rather than giving him the benefit of the presumption."

This is exactly what the majority opinion is doing in this case. He also said, "Even though we might disagree with the moral principle involved, a classification based upon moral principle is not legally invalid." In my view, the same applies here.

In *City of Bismarck v. Materi*, 177 N.W.2d 530 (N.D.1970), the court had under consideration the validity of a city ordinance permitting grocery stores operated by the owner-manager who regularly employs not more than three employees to do business on Sunday, whereas other businesses could not remain open. The court held that this did not constitute invidious discrimination as would be prohibited by the Equal Protection Clause, either under the United States Constitution or under the State Constitution. The court also observed that a statute is not to be struck down on the supposition that various differently treated situations may in fact be the same. There has been no showing, and no reason had been advanced, indicating that this principle or reason has been disregarded in the exemption provision. To the contrary, some convincing reasons have been stated.

In *Signal Oil and Gas Company v. Williams County*, 206 N.W.2d 75 (N.D.1973), we sustained the validity of § 57–02–04(3), NDCC, against the attack that it was unconstitutional because it classified for taxation as real property the machinery and equipment of oil and gas refineries and sugar beet refineries, while it did not classi-

fy the machinery and equipment of other processors of raw materials, such as lignite coal or potatoes, in such a manner.

In *State v. Knoefler*, 279 N.W.2d 658 (N.D.1979), we said:

"From our research, it appears that neither the United States Supreme Court, nor any Federal or State court has defined what constitutes an inherently suspect classification. Under these circumstances we do not believe it necessary or appropriate to formulate a definition. The United States Supreme Court, however, has treated classifications based upon race, alienage, or national origin as inherently suspect, and a plurality, in *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), included sex as being a suspect classification and thus subject to strict judicial scrutiny. See also *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). As to alienage, see *Nyquist v. Mauclet*, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1970). As to race, see *McLaughlin v. State of Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). As to illegitimacy, see *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651; but *Lalli v. Lalli*, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978), should also be considered.

"Based upon the foregoing decisions, we do not believe that § 4–12–03.1, NDCC, 'involves an "inherently suspect classification" or a "fundamental interest," ' and therefore is not subject to strict judicial scrutiny."

The same concept applies here.

On the matter of economics, the 1979 North Dakota Legislature provided for special consideration in financial transactions for persons involved in advancing finances to a person beginning farming operations. This clearly illustrates that there is an economic factor to be considered in farming which supports the exclusion of agricultural services under the Workmen's Compensation Act.

Furthermore, it must be observed and noted that the act does not prohibit agricultural employees from being covered under the workmen's compensation act for there is a special optional coverage feature which permits every employer engaged in agricultural activities to secure workmen's compensation coverage. The act in effect does not make it compulsory to secure workmen's compensation coverage for agricultural employees, but it does not prohibit the coverage—it makes it optional.

The majority suggests there have been substantial technological changes in farm operations within the period when the act was enacted and to the present date. Be that as it may, it is a well accepted principle of law that a person may question the constitutionality of a statute only as it applies to him but not as it may be applied to others. This, of course, necessarily includes the factual basis upon which the act is being challenged. In this instance, the injury occurred while Benson was in the process of bringing in a heifer when the horse he was riding fell on him and injured his leg. Benson may not rely upon technological changes, such as the use of tractors, combines, etc., to say that the act is unconstitutional as applied to him. Riding horses is as old as the practice of farming. Facts upon which the constitutionality of a statute may be challenged generally are only those which apply to the individual involved in the challenge. *United States v. Raines*, 262 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); *State v. Gamble Skogmo, Inc.*, 144 N.W.2d 749 (N.D.1966).

The United States Supreme Court in *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), announced the rule that a litigant may assert only his constitutional rights unless he can present some weighty countervailing policies. Countervailing policies would be recognized only if there were a violation of a positive constitutional right, as an example, those stated in the First Amendment. See *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

I can see no technological changes in riding horses on a farm. By the greatest imagination, there is no countervailing policy involved here.

The majority opinion attempts to rely upon *Rosebear v. Anderson*, 143 F.Supp. 721 (D.N.C.1956), 245 F.2d 673 (8th Cir. 1957), for support of its conclusion. Reliance upon this case is misplaced. In *Rosebear* the injured employee successfully resisted the application of the Workmen's Compensation Act. The employee did not want to be covered by the Act and brought a common law tort liability action against the farmer. The court held that because the farmer who had an option to come under the Act and did apply to come under the Act nevertheless failed to properly post notice in a conspicuous place of his election to come within the Act, and as a result the employee was not bound by the Workmen's Compensation Act. The majority is placing a peculiar strained construction on *Rosebear* to reach the result it did. If this is an example of what it did to the other cases, I can readily understand why it reached the faulty conclusion it did.

The reference to *Hughes v. Oklahoma*, —— U.S. ——, ——, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), is totally unwarranted as a basis to support the conclusion of the majority opinion. The *Hughes* case is governed basically by the commerce clause. The provision of law involved was an attempt to interfere with the commerce clause. The workmen's compensation statute does not attempt to regulate interstate commerce, as was the case in *Hughes*, and for that matter there is an exception granted for those employees involved in railroad and other types of employment engaged in interstate commerce.

Three standards of scrutiny, as set out in *Johnson v. Hassett*, 217 N.W.2d 771 (N.D. 1974), were recognized in *State v. Knoefler*, 279 N.W.2d 658 (N.D.1979), where we said:

"The difficulty, however, remains in determining which standard applies."

The majority opinion, without giving any reason or justification, merely states that the exclusion comes within the intermediate standard. I disagree.

In *Dunn v. North Dakota Workmen's Compensation Bureau*, 191 N.W.2d 181 (N.D.1971), this court held that there was a valid basis for placing officers of a corporation in a different classification than those of a partnership who were also executive officers of the partnership. The court reasoned that a partner is an owner who may secure coverage by special contract with the Bureau, whereas executive officers of the corporation do not have such authority. Peculiarly, the Act did not specifically rule out partnership executive officers, but the court reached this by construction because the Act only referred to executive officers of corporations doing work similar to that performed by employees. This is an instance where the court rather than the legislature noted an exception and then upheld the exception.

The majority opinion concludes that the claim is to be paid by the Workmen's Compensation Fund. All of the funds available to the Bureau, whether called catastrophe funds or otherwise, come from premiums collected from employers covered by the Act. How can this court imply or direct that these funds be used to pay the cost of the claim? What liability, if any, was incurred by those employer? If the legislature were to do this, then this court would have no hesitation to say it was invalid and unconstitutional because of lack of due process. I ask the question: What did the employers do to be penalized?

This entire question is one that should be resolved by the legislature and not by the court. If I were a member of the legislature I could vote to remove the exception, but as a member of the judiciary I cannot and should not.

On the basis of the majority opinion, I would have to conclude that from henceforth it would be difficult, if not legally impossible, to justify any exclusion or exemption because if this exclusion is legally considered to be an invidious discrimination then I have real difficulty in justifying any exemption or exclusion.

PAULSON, J., concurs.

PEDERSON, Justice (on petition for rehearing).

Even though I agree with petitioners, Benson and Amicus Curiae, when they say

that the dissenting Justices overlooked or misapprehended the law, I join in denying the petitions for rehearing for the reason that no productive purpose would be accomplished thereby.

The opinion which I authored and which was approved by a plurality also, however, overlooked or misapprehended the law in two specific respects. The plurality opinion quoted from *State ex rel. Olson v. Maxwell*, 259 N.W.2d 621, 629 (N.D.1977), leaving, apparently, an inference that the majority of this court intended that the Workmen's Compensation Bureau pay benefits to Benson regardless of the constitutionality or unconstitutionality of the statute. It was not so intended.

Secondly, in commenting upon this court's test of the statute's validity under the Fourteenth Amendment to the United States Constitution, the plurality opinion wrongfully stated: "The substantive due-process test would be inappropriate for that review." Although Justice Vogel, writing for a unanimous court in *Johnson v. Hassett*, 217 N.W.2d 771, 775 (N.D.1974), said that since 1937 the United States Supreme Court has *rarely* declared state law unconstitutional on substantive due-process grounds, he pointed out that a modification of this hands-off attitude is evident, and cited several cases and "commentators who have noted a remarkable resemblance between the 'old substantive due process' and the 'new equal protection.'" United States Supreme Court watchers have continued to find strong indications that the Justices do not always apply only the traditional rational-basis standard or the strict judicial-scrutiny standard. See recent commentaries by Thomas F. Lambert, Jr., in 35 ATLA Law Journal 132 (1974), Kenneth L. Karst in 91 Harvard L.Rev. 1 (1977), and John Hart Ely in 92 Harvard L.Rev. 5 (1978).

Whether the United States Supreme Court has or has not resurrected a form of the old substantive due-process test, by that or any other name, it is nevertheless obvious that federal courts at the circuit and district level, in practically all circuits, do not restrict their reviewing function artificially and do measure constitutionality under the Fourteenth Amendment to the United States Constitution, not by whim or caprice, but by a test in the nature of substantive due process. See *Jeffries v. Turkey Run Consolidated School District*, 492 F.2d 1 (7th Cir. 1974), and numerous decisions relying thereon.

A substantial federal question is involved.